Loring, J.,
delivered the opinion of the court:
The petitioner claims of the United States the sum of #31,400 for extras in the construction of an iron-clad propeller steamboat called the Ozark; and the court find the facts to be:
That on the 14th day of May, 1862, the petitioner contracted, in writing, with the United States for building, equipping, and fitting an iron-plated propeller gunboat, at Mound City, for the sum of #186,000, according to. the provisions of the contract and the specifications annexed thereto.
And among other things the contract provided as follows :
“ That the said parties of the first part do hereby contract and agree with the said parties of the second part that, for the consideration hereinafter named, they do hereby covenant and agree for themselves, executors, administrators, and assigns to build, equip, and fit the hull, steam machinery, and all its appurtenances, coal bunkers, instruments and tools, awnings, boats, anchors, cables, hawsers, casks, furniture, cooking utensils, and all the equipments and outfits connected therewith, necessary for an iron-plated screw-propeller., gunboat, the load-draught of water of which is not to exceed four feet nine inches from the bottom of the keel when ready, in all respects, for service, having on board an armament consisting of two eleven-inch guns and all her *429 equipments, a complement of 120 souls and all their effects, provisions and stores for 20 days, for which convenient storage shall have been provided, and 100 tons of coal in hunker. The said iron-clad gunboat to be delivered at Cairo, Illinois, at the expense of the party of the first part.
“ The said parties of the first part further agree, that the said vessels, equipments, outfit, machinery, appurtenances, coal bunkers, instruments, tools, spare pieces, &c., shall conform, in all respects, to the specifications and list of articles hereunto attached, which constitute a part of this contract, and are to govern the parties hereby contracting as truly as if the same were incorporated in this instrument; nor is the omission therein of any detail or object, necessary to carry into effect the intent of this agreement, to be to the detriment of the United States.
“ The said parties of the first part further agree, that all the materials, workmanship, detail, and finish shall be of the very best quality and free from defects, and each and all respectively bearing the tests made of similar articles in the naval service.
“ The said parties of the first part further agree, that the Secretary of the Navy shall have the right to appoint a person or persons to superintend the construction of the work, who shall have power to inspect it at all times, and to peremptorily reject, in any stage of its progress, any materials or articles, or any piece or part, which he or they may consider defective either in quality of materials or of workmanship, or in propriety of detail; and that they will provide the said person or persons suitable and convenient office room, and afford him or them satisfactory facilities for superintending the work.
“ The said parties of the first part do further' agree, that they will make, at their cost, and deliver to the Navy Department within one month after the completion of the machinery, neat drawings on double elephant paper, made to scale, of every piece or part used in the construction thereof; also, general plans showing the combination and arrangement of the whole, all to be in sufficient detail, with dimensions figured on, to enable the same to be again constructed, together with an inventory of the weight and material of each part of said machinery and of all its appurtenances.
“ It is further agreed by the said parties of the first part, that the vessel, perfectly fitted with all the machinery, equipments, and outfits of every kind complete, which this contract covers and is intended to cover, shall be delivered to the Navy Department, ready for naval cruising, (excepting only the armament, stores, provisions, and fuel for *430 steam machinery, not provided for in this contract,) on or before the period of 150 days from the date of this contract — that is, the 11th day of October, 1862. And it is further agreed that the work shall progress in proportion to the time.
“ The said parties of the first part further agree, that the magazines, shell rooms, light boxes and lamps, shot lockers, shot racks, and all parts connected therewith, and all arrangements connected with the hull and appertaining to the armament, shall be in accordance with such instructions as may he given from the ordnance bureau of the Navy Department; that all the apartments, state-rooms, store and other rooms, and fittings of every kind, shall be conveniently arranged and fitted to the satisfaction of the inspector appointed by the Navy Department.
“ And it is further agreed and mutually understood, that if the vessel’s draught of water exceed four feet nine inches the United States shall have the option of wholly rejecting it, recovering from the said parties of the first part the sums which may have been paid under this contract, as hereinafter provided. And in case the speed of the vessel falls below nine miles in still water the said party of the second part is entitled to wholly reject the vessel, recovering from the said parties of the first part the amount of money that may have been paid, as hereinafter stipulated, and in like manner for any other default.
“ The said parties of the first part do hereby guarantee the following points, namely:
“ First. A successful and satisfactory operation of every part of the machinery and appurtenances during a trial of 72 consecutive hours, under steam of the maximum pressure that the boilers can be made to furnish, not exceeding 140 pounds per square inch above the atmosphere, during which time the lubrication is to be thorough and eaBy, the journals free from heating, the stationary parts free from working or -motion on their fastenings, and the whole performance of such a character as to demonstrate the satisfactory strength, reliability, and practical efficiency and durability of the entire machinery. The said trial trip to be made at the expense of the said party of the second part.
“ Second. That during the period of one month from the termination of the above trial there shall he no deterioration or depreciation of the materials of which any of the machinery and its appurtenances are composed beyond that of ordinary friction. And there shall be no fracture of any of the parts from imperfection in general design, design of detail, quality of material, or from faulty workmanship.
*431 “ Tbe entire responsibility of fulfilling tbe above guarantees is to rest witb tbe said parties of tbe first part, wbo shall make tbeir own general and working drawings, both for tbe bull and machinery, and arrange and proportion tbe details in such manner as they may deem best calculated to secure the most -successful operation, rigorously adhering to the specifications hereunto annexed, and forming part of this contract, for such parts as are therein mentioned.”
Tbe specifications attached to said contract contained the following provision:
“ The vessel to be complete in every respect (except ordnance, ordnance stores, fuel for engine) and ready to receive ber crew, provisions, and stores; and any omission in these specifications will not relieve tbe contractor from furnishing the objects necessary, nor the material and labor that may be required for that end, and for which there are to he no extra bills presented.”
While the Ozark was in the progress of construction, and on or about the 9th day of January, 1863, orders from the Navy Department at Washington were received at Mound City by Commodore Hull, of the navy, charged with the supervision of the construction of the Ozark, to apply to her the Whittaker apparatus for submarine firing, at an expense not exceeding $5,000.
At the time the above order was given the Ozark was on the ways. The preparations for putting in the Whittaker apparatus were made, and the work began by alterations in her hull, and putting in heavier timbers, &c., and continued till, upon representations made to the department by Commodore Hull and the petitioner that the application of the Whittaker apparatus would require alterations and time, and, by making tbe boat trim by tbe bead, impair ber efficiency, orders were given by the Navy Department, on or about January 20, 1863, to suspend the work for the introduction of the Whittaker apparatus. And on or about the 10th of February, 1863, orders were given that the Whittaker apparatus should not be put into the Ozark, and on the 11th of February it was ordered that she should be completed as soon as possible according to the original plan.
Tbe alterations made in tbe original plan of the boat for the application of the Whittaker apparatus, by the orders of the United States, made ber heavier and slower, and more power necessary to propel her. The boat was launched on the 18tb of February, 1863, and a trial trip was had, when it was found she trembled, and further alterations and additions were ordered by the United States to give her .strength, and these were made and increased her weight about fifty tons, and *432 two additional boilers and their appurtenances, not provided by the contract, were ordered by the United States and put into her to give her additional power to overcome her increased weight.
The boat was delivered to the United States and accepted by them. The contract price of $186,000 was paid by the United States to the petitioner, together with the further sums of $20,053 85 for extras furnished in materials and labor during the progress of construction, and not required by the contract.
The petitioner claimed of the United States, as extras for materials furnished and work done by order of the United States, beyond the requirements of the contract and its specifications, and not included in the extras paid for as aforesaid, the following items at the prices stated, amounting to $3,437 46:

To George C. Bestor, Dr. to work done on board United States steamer Ozark:

To additional boilers and appurtenances over specification and contract...-. $7,000 00
Blower engine, blower and pipe... 2,100 00
Onecloek...-...-. 15 00
Two thermometers and slate.. 7 50
Tackle for hoisting ashes.,. 59 63
Extra steam gauge and pipe...-. 54 94
Syphon pumps. 523 52
One steam signal whistle.. 35 00
Engineer’s lockers and drawers. 49 19
Bench for large vice. 47 50
Two wrought-iron lead ladles. 11 00
Ratchet drill brace. 35 00
Crab for drill brace. 85 00
Sixteen drills. 24 00
Eive tap wrenches. 25 00
Six extra gauge cocks. 30 00
Six gauge-cock boxes. 75 00
Four pairs gas tongs. 20 00
Bleeders to heaters and steam gauge. 278 73
Enlargement of escape pipe from 6-J- to 8 inches. 375 00
Extra feed-water heater. 277 75
Extra wood for cog wheels. 15 00
Turret awning. 275 00
Putting in extra timbers under transverse keelsons to support turret machinery, not on Captain Ericsson’s plan. 71 00
Stanchions and fore and aft pieces and keelsons to strengthen floor of ship under engine frame. 284 50
Changing bulkheads on account of change of cabin plans. 340 00
Putting in athwart-ship hog chains. 670 00
*433 Blacksmith labor and material in bracing bottom of vessel under engine, and fitting in braces. $608 20
Deck pump, brake stand, fitted complete. 45 00
13,437 46
And tbe farther sum of $3,400, paid by him for the use of the ways, at the rate of $100 per day, for 34 days, during which said boat was detained for the application of the Whittaker apparatus and alterations made by the orders of the United States. And the petitioner applied to the engineer for certificates therefor, but was refused, and payment therefor was refused by the United States.
And the court find that two extra boilers and their appurtenances, which were not required by the original contract and its specifications, nor contemplated therein, were put into the boat by the orders of the United States, and have not been paid for, and that the petitioner is entitled therefor to the sum of $6,000.
And that the said gunboat was detained on her ways, by the' alterations required for the application of said Whittaker apparatus and the orders of the United States, beyond the time in which she would otherwise have been launched, for twenty days, and that the petitioner is entitled therefore to the sum of $2,000.
And that the other items specified in said claim were included in the original contract, or have been paid for previously to this trial.
And judgment is to be entered for the petitioner for the sum of $8,000.
The provisions of the contract excluding extras apply, we think, to the vessel described in the contract, and to details necessary for that, and do not apply to alterations from, or addition to, the plan fixed by the contract.